UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,                      MEMORANDUM AND ORDER
                                                       15 CR 511 (ILG)

   -against-

NATHANIEL COLTER,

                Defendant.
------------------------------------------------x
GLASSER, United States District Judge:

      A motion has been made to suppress a gun, the possession of which caused the defendant to be indicted. A hearing was held on that motion on May 23, and continued to conclusion on June 7, 2016.

      In support of the admissibility of the evidence, the government called two witnesses: NYPD Officers Ingenito and Smith. The defendant called Sara Howard, an investigator employed by the Federal Defender.

      Having heard the testimony of the witnesses, observed their testifying demeanor, their responsiveness to questions on direct and cross examination, I make the following findings of fact and conclusions of law.

      At approximately 11:15 p.m. on November 12, 2015, NYPD Officers Ingenito and Smith, were patrolling in an unmarked car in the area embraced by the 73rd Precinct, also described in police parlance as Brooklyn North Anticrime. Driving westward on Pitkin Avenue, they found themselves behind 3 or 4 cars backed up, impeded by a livery cab parked diagonally across the intersection of Pitkin Avenue and Sackman Street. They maneuvered their car around those that were blocked and pulled up alongside the parked livery cab to tell the driver to keep moving. When he didn't appear to hear that,

Officer Ingenito got out of their car to speak to him.  As he did, he saw a passenger in the rear seat "lunge" forward.  May 23 Tr. at 12.  Continuing to walk toward the driver, he shone his flashlight through the rear window and noticed the butt of a gun lying on the floor on top of light colored clothing.  He then asked the passenger to get out of the cab, confirmed that what he saw was a gun and placed him under arrest.

Officer Smith's testimony was essentially the same in all material respects. To be sure, as in any case in which the events in issue occurred months before, players in those events are called upon to recall the roles they played as the events unfolded.  As is generally true, a vigorous cross examination about the minutest detail, reveal minor inconsistencies which are then trumpeted as impugning the credibility of the witnesses. A line-by-line reading of the transcripts of the testimony of Officers Ingenito and Smith, on direct and cross examination, however, reflected relative consistency.

Ms. Howard, having months later attempted to simulate the events as described by the officers, was gratuitously permitted to testify, although her testimony had no probative value and was completely discounted.  June 7 Tr. 17.

The motion to suppress is based entirely on the premise that the livery cab was stopped while it was moving, a stop that "was not justified by any suspicion of criminal activity."  Given that premise, the argument is then made that "any evidence recovered as a result of the unlawful stop is suppressible as fruit of the poisonous tree, as a violation of the Fourth Amendment of the United States Constitution." DE 24 at 4.  That premise is based entirely on the Declaration of the defendant submitted in support of his motion in which he states, "From the back right passenger seat, I could see that the

2

driver was driving safely and properly down the street. He was not committing any traffic infraction visible to me. He was not impeding traffic in any way. He was simply driving down the street." DE 29.

The testimony of Officers Ingenito and Smith was consistently to the contrary. On direct examination, Officer Ingenito testified:

> Q: At that time, did you stop the cab?
>
> A: No.

Tr. at 11.

On cross examination he testified:

> Q: At the time when you first saw the livery cab, was it moving or still?
>
> A: Still.
>
> Q: So, at the time that you saw it, it was already in the catty corner position that you indicated earlier?
>
> A: Yes.

Id. at 22-23.

On direct examination, Officer Smith testified:

> Q: And at that time did you stop the cab?
>
> A: No.

Id. at 61.

The inference that the livery cab was not moving and was stopped was bolstered by the testimony of both Ingenito and Smith, that the driver and rear passenger were

3

engaged in conversation. Ingenito: "I observed the rear passenger and the driver, they were having a conversation." Tr. at 11. Smith: "I saw the cab driver and the passenger having a conversation . . . the cab driver's head . . . kept turning back and forth like there was a conversation going on." Tr. at 60.

But for the defendant's declaration on that issue, which rings hollow in the context of the responsive, consistent, detailed testimony of Officers Ingenito and Smith I found completely credible, there wasn't an iota of evidence to discredit it. Colter chose not to take the stand and rebut their version of events although he could have done so without risk that anything he said there could later be used against him at trial. Simmons v. United States, 390 U.S. 377 (1968).

I am aware that the Court of Appeals has not yet decided whether an adverse inference may be drawn from a defendant's unwillingness to testify at a suppression hearing. United States v. Male Juvenile, 121 F.3d 34, 42 (2d Cir. 1997). Until it does, I will not "embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant," Spector Motor Service v. Walsh, 139 F.2d 809, 823 (2d Cir. 1944) (L. Hand, dissenting) and I draw no inference from Colter's failure to testify. I make that observation only to emphasize that the government's evidence compels me to conclude that the livery cab was already stopped at the intersection of Pitkin Avenue and Sackman Street when Officers Ingenito and Smith approached it.

Officer Ingenito's action in shining his flashlight to illuminate the interior of the livery cab "trenched upon no right secured to [Colter] by the Fourth Amendment."

Texas v. Brown, 460 U.S. 730, 739 (1983); Molica v. Volker, 229 F.3d 366, 369 (2d Cir. 2000) ("[A] police officer looking through the windows into the vehicle from the outside, even when shining a flashlight to look inside of the vehicle, does not constitute a 'search' of the vehicle within the meaning of the Fourth Amendment."), and "passengers have no Fourth Amendment interest in not being ordered out of a car." Maryland v. Wilson, 519 U.S. 408 (1997). The gun, discovered inadvertently, the incriminating nature of which was immediately apparent, was lawfully seized in accordance with the plain view exception to the Fourth Amendment. Illinois v. Andreas, 463 U.S. 765, 771 (1983); United States v. Jenkins, 876 F.2d 1085, 1088 (2d Cir. 1989), cert. denied, 502 U.S. 1014 (1991). It is worthy of note that in his Declaration, Colter acknowledges that "on the floor of the livery cab, I had a plastic bag that I had brought into the livery cab, inside the bag, wrapped in sweat pants, was a gun," but which he states was not visible.

The notice of motion filed by the defendant also sought to "suppress any statements . . . allegedly made by the defendant to government agents . . . pursuant to Fed. R. Cr. P. 12(b)(3)(C); 18 U.S.C. § 3501 and the Fourth and Fifth Amendments . . . ." The defendant's Declaration in support of his motion states "The officer placed me under arrest and placed me in the police car. While I was in the car, the officer asked me questions about a gun. They did not provide me with Miranda warnings. I answered their questions." DE 29.

The record of the hearing on this issue is very sparse. Officer Ingenito testified as follows on direct examination:

> Q: Did you advise the defendant of his *Miranda* rights that evening?
>
> A: No.
>
> Q: Did you question the defendant?
>
> A: No.
>
> Q: Did he say anything to you?
>
> A: Yes.
>
> Q: What did he say?
>
> A: When we were going back to the 73rd precinct, he asked what he was under arrest for. I told him that he was under arrest for possession of the firearm. And he told me that I didn't find a firearm on him; that I found it on the floor of the cab.
>
> Q: Did the defendant say anything else?
>
> A: No.

On cross examination, after establishing that the defendant was handcuffed and in custody in the police car:

> Q: And that's when you say that he asked why he was under arrest?
>
> A: Right.
>
> Q: And when he asked why he was under arrest, you chose to answer that question?
>
> A: Yes.

Q: You did not give him his *Miranda* warnings at that point?

A: No.

Q: You told the person that he was under arrest for a gun?

A: Yes.

Q: That's when he made various statements to you?

A: Yes.

The testimony of Officer Smith was similarly sparse. His direct examination was:

Q: Did you advise the defendant of his *Miranda* rights that evening?

A: No.

Q: Did you question him?

A: No.

Q: Did the defendant say anything?

A: He asked me why he was being arrested.

Q: And was he told anything in response?

A: I told him, yes, a firearm.

Q: You told him he was arrested for a firearm?

A: Yes.

Q: And did he respond?

A: He said what firearm?

Q: Do you recall if he said anything else?

A: No.

He was not cross examined on that testimony.

It requires no extended discussion of the law surrounding <u>Miranda</u> to conclude that the statement made by the defendant was not in response to police interrogation or its functional equivalent, and the law was not violated. For all the foregoing reasons, the motion to suppress is Denied.

SO ORDERED.

Dated:	Brooklyn, New York
	June 24, 2016

_____/s/_____<br>
I. Leo Glasser